IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK CRESS, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION |
| | : NO. 13-89 |
| ODEIDA DALMASI, et al., | : |
| Defendants. | : |

MEMORANDUM

TUCKER, C.J.                                                                                       May _____, 2014

Plaintiff Frederick Cress brings this action for Eighth Amendment violations against medical officials and administrators at the Federal Detention Center in Philadelphia, Pennsylvania, claiming that these individuals were deliberately indifferent to his serious medical needs. Presently before the Court is Defendants Odeida Dalmasi, Hussain Bokhari, Akinwale Sogo, Edward Bangor, Harley Lappin, Brian Patton, and Troy Levi's unopposed Motion to Dismiss or, In the Alternative, for Summary Judgment (Doc.11). Upon consideration of this Motion and Plaintiff Frederick Cress's Complaint (Doc. 3), and for the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED**.

I.     **FACTS AND PROCEDURAL BACKGROUND**

Because the Court writes primarily for the parties, the Court sets forth only those facts that are relevant to its conclusion. Plaintiff Frederick Cress ("Cress") is currently a prisoner in the Federal Detention Center ("FDC") in Philadelphia, Pennsylvania and has been housed in this facility since February 18, 2010. (Compl. at ¶ 1.) In the first week of April 2010, Cress informed Hussain Bokhari ("Bokhari"), a member of FDC's medical staff, that he was experiencing burning pain coming from either the lower portion of his esophagus or the upper portion of his

stomach, and that his stool had been unusually thin of late. (Compl. at ¶ 2.) Bokhari responded by prescribing Ranitidine, "a medicine used to prevent ulcers and treat gastroesophageal reflux disease." (Id.) In the first week of May 2010, Cress informed Bokhari that his symptoms were persisting and Bokhari renewed Cress's medication and advised Cress to drink more water. (Compl. at ¶ 3.) Cress informed Bokhari two more times in May of 2010 that his symptoms remained and was given the same advice by Bokhari. (Compl. at ¶ 3-5.) In the fourth week of May 2010, Cress informed another FDC medical staff person, Edward Bangor ("Bangor"), of his symptoms and was told that Bangor would soon respond to his concerns. (Compl. at ¶ 6.)

Cress continued his complaints in the first three weeks in June of 2010 and was told by Bokhari that he should continue with his prescribed medical regime and start to consume laxatives. (Compl. at ¶ 7-9.) Cress complained to Bokhari again in the first week of July 2010 and Bokhari responded by drawing blood from Cress to be tested. (Compl. at ¶ 10.) Cress informed Bangor and another FDC medical staff member, Odeida Dalmasi ("Dalmasi"), of his persisting symptoms in July of 2010 and requested that Dalmasi test his excrement because Cress was beginning to notice blood in his stool. (Compl. at ¶ 11.) Dalmasi and Bangor stated that the blood Bokhari drew earlier revealed no problems and that Cress had no treatable medical issues. (Id.)

In the first week of August of 2010, Cress informed another FDC medical staff official, Akinwale Sogo ("Sogo"), of his symptoms while brandishing a plastic bag containing his stool and requesting that the contents of the plastic bag be tested. (Compl. at ¶ 12.) Sogo requested that Cress dispose of his stool and stated that he would contact a doctor. (Id.) In the second week of August 2010 Bangor prescribed a new medication for Cress and informed Cress, after a request was made, that FDC did not order the testing of stool. (Compl. at ¶ 13.) In the fourth

week of August 2010, Cress informed Dalmasi and Bangor that the previously prescribed medications were having no effect. (Compl. at ¶ 15.) Bangor responded by prescribing for Cress a medication for psychological disorders. (Id.) In the same week, Cress informed the FDC Warden at the time, Troy Levi ("Levi"), of his issues with FDC medical personnel and was ignored by Levi. (Compl. at ¶ 16.) In September of 2010, Cress was told by both Sogo and Bangor that there was nothing they could do to relieve Cress's symptoms. (Compl. at ¶ 18-20.) Cress was also reminded by Dalmasi that FDC did not test stool samples. (Compl. at ¶ 19.)

In the first week of October of 2010, Cress provided Bangor a document from 2003 detailing a previous physician's diagnosis and successful treatment of the same symptoms about which Cress had been complaining for the prior six months. (Compl. at ¶ 21.) Bangor stated that he would review the information and enter it into Cress's medical file. In the second week of October 2010, after additional complaints, Bokhari stated that Cress was being referred to FDC's psychology department because Bokhari believed Cress's symptoms were delusions. (Compl. at ¶ 22.) Nevertheless, Bokhari still performed a prostate exam on Cress and concluded that there was no blood in Cress's stool. (Id.) In November of 2010, Bokhari again stated the he believed Cress's symptoms were actually delusions and again performed a prostate exam on Cress that revealed no blood in Cress's stool. (Compl. at ¶ 24.) In the same month, after Cress provided Bangor with a plastic bag containing his stool, Bangor examined the sample and concluded there was no blood in Cress's stool. (Compl. at ¶ 25.) Bangor further advised Cress to continue to take his psychological medication and Ranitidine, prescribed fiber pills, and ordered a CT scan for Cress. (Id.) In March of 2011, Bangor reported that the CT scan results noted that Cress had large amounts of stool in his colon and advised Cress to continue to take his prescribed medications. (Compl. at ¶ 25-28.)

In the third week of April of 2011, Bangor expressed the sentiment that if Cress continued to seek relief for his physical ailments from FDC's medical staff, he would be placed in FDC's disciplinary unit and his medical concerns would thereafter be handled by FDC's psychology department. (Compl. at ¶ 29.) The next week, Bangor gave Cress a medication, Citrate, intended to clear his bowels but that too was unsuccessful. (Compl. at ¶ 31.) In the second week of May 2011, Bangor ordered a colonoscopy for Cress and advised him to continue to take his prescribed medication. (Compl. at ¶ 32.) In November of 2011, Cress was transported to a hospital for his colonoscopy and was told by the doctor who performed the procedure that his colon appeared normal and free of impacted fecal matter. (Compl. at ¶ 33.) Cress was also informed that the procedure revealed nothing abnormal but that Cress's complained-of symptoms would warrant further tests not ordered by FDC prison officials. (Id.)

In the first week of December 2011, Cress informed Bangor that his symptoms were not abating and that his prescribed regime of medications was having no effect. (Compl. at ¶ 34.) Bangor responded by taking Cress off of Ranitidine and advising Cress to continue taking his psychological medicine and fiber pills. (Id.) Cress was then prescribed another psychological medication, Buspirone. (Id.) In the first week of April 2012, Bangor advised Cress to abstain from caffeine and spicy foods and continue to take his medication. (Compl. at ¶ 35.) In May of 2012, in response to another complaint, Cress was told by Bangor and Dalmasi that he would no longer receive treatment from FDC's medical department and that he was to receive all his treatment from FDC's psychology department. (Compl. at ¶ 36.)

However, after repeated requests from Cress, Bangor conducted a urine screen for Cress in August of 2012 that revealed there was blood in Cress's urine. (Compl. at ¶ 39-40.) After further complaints, a second urine screen was conducted in September 2012 with the same result.

(Compl. at ¶ 41.) In the second week of October 2012, Cress again provided Bangor with a copy of the diagnosis and treatment plan that had successfully been used to treat Cress's symptoms in 2003. (Compl. at ¶ 43.) After a third urine screen, Bangor announced that the results showed that there was no longer blood in Cress's urine and prescribed a medication for Cress, Omeprazole, designed to treat ulcers. (Id.) Finally, after further requests, Cress was told by Bokhari in October 2012 that there was nothing wrong with him. (Compl. at ¶ 44.) In November 2012, Bangor also stated similarly that there was nothing he could do for Cress. (Compl. at ¶ 45.)

On January 29, 2013, Cress filed the instant action against Dalmasi, Bokhari, Sogo, Bangor, Levi, Harley Lappin, and Brian Patton (collectively, "the defendants") under the implied cause of action granted by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* for violation of his Eighth Amendment rights due to the quality of medical care he has received as a prisoner housed in FDC.[1] 403 U.S. 388 (1971). Cress claims to sue all defendants in their personal and official capacities. Cress is suing defendants Odeida Dalmasi, Hussain Bokhari, Akinwale Sogo, and Edward Bangor due to their roles as medical staff in FDC. Cress has also brought suit against Levi as the former Warden of FDC and Brian Patton ("Patton"), the current Warden, for their roles in overseeing the formal and informal policies followed by FDC's medical officials. (Compl. at ¶ 46.) Cress also claims Levi is liable for his role in personally denying Cress administrative remedy despite Cress's complaints. (Id.) Further, Cress states that Director of the Federal Bureau of Prisons, Harley Lappin ("Lappin") is liable for his role in

---

[1] Cress's Complaint contains a mix of *Bivens* and 42 U.S.C. § 1983 claims. In *Bivens*, the Supreme Court recognized an implied cause of action to recover damages against federal agents for constitutional violations. § 1983 covers constitutional violations made by state actors. Because Cress alleges that all of the actors he brings suit against were federal employees and because he does not allege any of these actors were acting under the color of a particular state authority, this Court will read his action as brought solely under *Bivens*.

overseeing federal wardens. On August 5, 2013, the defendants filed the instant motion to dismiss, which Cress has failed to oppose. The Court's analysis follows.

## II. STANDARD OF REVIEW

A court may dismiss a plaintiff's complaint under Rule 12(b)(6) only when it does not state a claim for relief that is "plausible on its face." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). All well-pleaded factual allegations contained in a plaintiff's complaint must be accepted as true and must be interpreted in the light most favorable to the plaintiff. *Argueta v. United States Immigration and Customs Enforcement*, 643 F.3d 60, 74 (3d Cir. 2011). A complaint is plausible on its face when its factual allegations allow a court to draw a reasonable inference that a defendant is liable for the harm alleged. *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010).

To determine the sufficiency of a complaint, courts of the Third Circuit are required to perform a three-step analysis. *Id.* at 130. First, a court must identify plaintiff's claims and determine the required elements of those claims. *Id.* Next, a court must identify and strike allegations contained in plaintiff's complaint that are, in actuality, conclusions. *Id.* Finally, a court must determine if the remaining factual allegations, "plausibly give rise to an entitlement for relief." *Id.*

The focus of a court's inquiry into the sufficiency of a plaintiff's complaint is always plausibility of relief. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). This step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Plausibility does not require a plaintiff's complaint to demonstrate that entitlement to relief is likely or probable. *Argueta*, 643 F.3d at 72.

A plaintiff's complaint must only plead facts sufficient, "to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *McTernan v. City of York, PA*, 564 F.3d 636, 646 (3d Cir. 2009) (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)) (citations omitted). "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *McTernan*, 564 F.3d at 646 (citing *Phillips*, 515 F.3d at 231).

### III. DISCUSSION

The defendants have filed a motion to dismiss arguing: (1) Cress's claims are meritless and he fails to state a claim upon which relief can be granted; (2) defendants are entitled to qualified immunity because they did not violate any clearly established constitutional or statutory right of which a reasonable person in their positions would have been aware; (3) defendants Levi, Patton and Lappin should be dismissed because a *Bivens* action cannot be premised on supervisory liability; and (4) *Bivens* does not provide a remedy against defendant Bangor because actions against public health service officers must be brought under the Federal Tort Claims Act. Because the Court finds that Cress's claims are meritless and that he fails to state a claim upon which relief can be granted, the Court declines to address the defendants' further arguments.

### *Cress Fails to State a Claim upon which Relief can be Granted*

In *Bivens*, the Supreme Court held that, with regard to Fourth Amendment violations, "a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389; *see also Bistrian v. Levi*, 696 F.3d 352, 365-67 (3d Cir. 2012). Subsequently, the Court further extended this implied right of action to the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Bistrian*, 696

7

F.3d at 365-67; *see also Carlson v. Green*, 446 U.S. 14 (1979). In the instant matter, Cress claims that the defendants violated his Eighth Amendment rights by ignoring his serious medical needs.

The U.S. Supreme Court has set the standard a plaintiff must meet in order to establish an Eighth Amendment violation based on a failure to provide adequate medical care in *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). Under *Estelle*, a plaintiff must allege facts that show (1) a serious medical need and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Id*; *see also Thomas v. Dragovich*, 142 Fed.Appx. 33, 35-38 (3d Cir. 2005) (". . . a plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of the defendant's denial was sufficiently serious. Additionally, the plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.'") (quoting *Wilson v. Seiter*, 501 U.S. 294, 290 (1991)); *Pearson v. Prime Care Med., Inc.*, Civil Action No. 12-5076, 2013 WL 5340554, at *2 (E.D.Pa. Sept. 23, 2013).

Satisfying the first prong of the *Estelle* inquiry requires a demonstration of a "serious" medical need. A medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Mitchell v. Gershen*, 466 Fed.Appx. 84, 86 (3d Cir. 2011) (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)) (citations omitted). A medical need is also considered serious if its denial results in "a life-long handicap or permanent loss." *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (citations omitted).

Satisfying the second prong of the *Estelle* inquiry requires a showing of "deliberate indifference." To establish this, a plaintiff must show that defendants (1) knew of and

8

disregarded an excessive risk to an inmate's health or safety or (2) were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that defendants drew that inference. *Mitchell*, 466 Fed.Appx. 86-87; *Pearson*, 2013 WL 5340554, at *3; *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Third Circuit has found "deliberate indifference" in a number of circumstances, including cases in which a prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993)) (citations omitted). The Third Circuit has also found "deliberate indifference" when a prison official persists in a particular course of treatment "in the face of resultant pain and risk of permanent injury." *Rouse*, 182 F.3d at 197 (quoting *White v. Napoleon*, 897 F.2d 103, 109-11 (3d Cir. 1990)).

Here, Cress makes the argument that the defendants' actions constitute deliberate indifference because:

> [A]s a matter of law it is reasonable to infer that defendants were intentionally inflicting the above-mentioned physical pains upon plaintiff. . . . Further, as demonstrated above, defendants' repeated refusals to implement the previously prescribed, successful treatment for plaintiff's previously diagnosed symptoms also sufficiently demonstrates defendants' "deliberate indifference" to plaintiff's "serious" medical needs, as a matter of law.

(Compl. at ¶ 48.) The defendants do not argue that Cress's problems were not serious but instead maintain that the alleged actions of the medical staff and officials at FDC fail to show the deliberate indifference required under *Estelle*. Taking all of Cress's allegations as true, the Court finds FDC personnel cannot be said to have been deliberately indifferent to Cress's serious medical needs.

9

The FDC medical staff first heard of Cress's complaints in April of 2010 and prescribed Ranitidine. (Compl. at ¶ 2.) In May of 2010, Cress's prescription was renewed and he was advised to drink more water. (Compl. at ¶ 3.) This prescription was renewed a number of times. (Compl. at ¶ 3-8.) Cress was advised to consume laxatives in June of 2010. (Compl. at ¶ 8.) Blood was also drawn from Cress on July of 2010. (Compl. at ¶ 10.) In August 2010, an ulcer medication was prescribed for Cress. (Compl. at ¶ 13.) In the last week of August 2010, after an incident in which Cress brandished a plastic bag containing his stool through the window of his locked cell door, Bangor prescribed three months of Sertraline, "a drug used to treat sundry psychological disorders." (Compl. at ¶ 15.) In October of 2010, Bangor told Cress that he was being referred to FDC's psychology department based on his belief that Cress's claims were delusions. (Compl. at ¶ 22.) At this point, Cress had been told a number of times that FDC medical staff had found nothing physically wrong with Cress and that various FDC staff believed that there was nothing seriously wrong with him physically, though they inquired about his mental state. (Compl. at ¶ 9, 14, 17, 18, 20.) In October of 2010, Cress received his first prostate exam that showed no sign of blood in his stool. (Compl. at ¶ 23.) In November of the same year he received another prostate exam that returned negative results. (Compl. at ¶ 24.) In early 2011, Cress was taken to a Philadelphia hospital under non-emergent circumstances and given a CT Scan that revealed a large amount of fecal matter in his colon. (Compl. at ¶ 25-28.) FDC medical staff continued different methods of symptom alleviation including giving Cress a bottle of Citrate, "a liquid intended to clear the bowels," discontinuing his Ranitidine medication, prescribing fiber pills, and ordering a colonoscopy that ultimately revealed nothing abnormal. (Compl. at ¶ 31-34.) In April of 2012, Cress was instructed to alter his diet. (Compl. at ¶ 35.) Finally, Cress was given three urine screens from the period of August 2012 to September 2012.

(Compl. at ¶ 39-43.) After the first two revealed blood in Cress's urine, he was given another medication called Phenazopyridine. (Id.) In October of 2012, his third urine screen revealed that no traces of blood remaining present in his urine and he was given another medication, Omeprazole, designed to treat ulcers. (Id.)

       These facts as conceded by Cress in his own Complaint show that the medical staff at FDC not only provided Cress with medical care but repeatedly changed their method of treating Cress's problems when previous courses of treatment proved ineffective. They provided Cress with medications related to his complained of symptoms and even continued to perform various diagnostic tests despite numerous indications that he in fact had no remaining physical ailments. Cress's behavior also prompted FDC officials to suspect and treat possible mental ailments from which Cress may have been suffering. At no time did FDC officials intentionally refuse to provide medical care, though FDC medical staff repeatedly cautioned that Cress would begin receiving his care from the FDC psychology department. Further, Cress does not allege and none of the facts provided suggest that the treatments listed above were delayed by FDC medical staff for non-medical reasons. Even when the medical staff questioned Cress's mental health, they prescribed psychological medications in conjunction with medication meant to relieve the physical ailments of which Cress complained. Cress also makes no claim, nor do the facts support, that FDC officials prevented Cress from receiving needed or recommended treatment. Cress's general criticism in truth lies with FDC medical staff's pursuit of a course of treatment with which he disagreed.

       Cress asserts that because defendants pursued a number of unsuccessful treatments and ignored information he provided evidences an intent among FDC staff to impermissibly prolong his suffering. However, based on the facts provided by Cress, the Court cannot to conclude that

11

FDC staff is guilty of violating Cress's constitutional rights simply because they disagreed with his preferred diagnosis and treatment, and instead pursued a different course of action with regard to his symptoms. It is well-established that mere disagreements over medical judgments do not rise to the level of Eighth Amendment violations. *White*, 897 F.2d at 110; *Williams v. Kort*, 223 Fed.Appx. 95, 100 (3d Cir. 2007) ("Disagreements over medical judgment or treatment . . . cannot form the basis of an Eighth Amendment claim."). Even if the Court construed Cress's allegations as a disagreement not between FDC medical staff and Cress but between FDC medical staff and Cress's former treating physician, it would still fail as a violation under the Eighth Amendment. *White*, 897 F.2d at 110 ("[N]o claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.")(emphasis omitted).

Indeed, the bar for deliberate indifference is much higher and requires "'obduracy and wantonness,' which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk" on the part of the responsible parties. *Rouse*, 182 F.3d at 197 (citing *Whitley v Albers*, 475 U.S. 312, 319 (1986) and *Farmer*, 511 U.S. at 842). Cress fails to plead facts that suggest FDC medical staff knew of or were aware of facts from which to infer any significant risk or injury could result from their course of treatment. Indeed, the facts presented show FDC medical staff was repeatedly faced with test results, undisputed by Cress, which showed an absence of the physical maladies of which Cress complained. The FDC staff's failure to alleviate Cress's pain despite their perpetual efforts to pursue a successful course of action, when couple with mostly negative results from the many exploratory tests conducted, cannot be the basis upon which a deliberate indifference for Cress's suffering is found.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss will be granted. An appropriate order follows.